THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHNNY HOUSTON, Defendant-Appellant.

First District (4th Division)   No. 1—88—2637

Opinion filed December 3, 1992.

Randolph Stone, Public Defender, of Chicago (Denise Avant, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Veronica X. Calderon, and Ketki M. Shroff, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

Following a jury trial, the defendant, Johnny Houston, was convicted of criminal sexual assault, home invasion, and armed robbery against the person and property of Patricia and was sentenced to 60 years. On appeal, the defendant contends: (1) the court erred in denying his motion to quash his arrest and suppress the lineup identification on the basis that the police did not have probable cause to arrest him; (2) the testimony of a State witness regarding the lineup identification should have been suppressed because the police failed to preserve the photograph of that lineup; (3) that he was denied a fair trial because the court incorrectly admitted evidence of similar offenses committed against other women; (4) the State made improper comments during its opening statement and closing argument; (5) the court committed reversible error in refusing to give the defendant's proposed jury instruction on identification; (6) that he was denied a fair trial and was unfairly prejudiced because a State witness testified that she viewed "mug shots"; (7) that the cumulative impact of the trial errors deprived him of a fair trial; (8) that he was deprived of a fair sentencing hearing because the judge made a prejudicial comment to a defense witness; and (9) his sentence was excessive.

Prior to trial, the defendant made a motion to quash arrest and suppress the lineup identification testimony. At the hearing, the defendant testified that on August 29, 1987, he was living with his mother, Annie Carr. Officer Keenan went to their home to speak with the defendant. Since he was not at home, Keenan left a phone number for the defendant to call when he returned. Later that afternoon, the defendant returned Keenan's call but was unable to reach him. About 30 minutes later, the police knocked at his door, identified themselves as the police, told the defendant they had a warrant, and asked to speak with him. The defendant let them in, asked to see their warrant and the police told him that the papers were at the station. The defendant testified that he refused to go to the station and one of the officers told him "you'll go one way or another." The defendant was arrested and placed in a lineup with four other men. Four women, Patricia, Gayle, Paula, and Joan, viewed the lineup separately and identified the defendant as the man who had committed offenses against them.

Officer Keenan from the Chicago police department testified that on August 19, 1987, he was investigating a series of rapes in

the DePaul area. A photograph of the defendant had been tentatively identified by one of the victims. On August 29, 1987, he went over to the defendant's home to speak with him, and when he was not at home, he left a message with his mother directing the defendant to telephone him at the police station.

Detective Hagen testified that on August 25, 1987, he conducted a photo array lineup and Gayle tentatively identified the defendant's photo as that of her offender.

Detective Kurth testified that he conducted a lineup on July 30, 1987. Paula, Joan, and Pat could not identify anyone in the lineup. There were five individuals in the lineup and the defendant was not one of them.

Detective Annerino testified that on August 29, 1987, he went to the defendant's home with several other officers. The officers informed the defendant of the photo identification and the allegations against him. They asked the defendant to accompany them to police headquarters to assist them in their investigation. The defendant was handcuffed and taken to the station. The police did not have an arrest warrant.

Ms. Carr, the defendant's mother, testified that on August 29, 1987, the defendant answered the door and the police came in and asked him to go to the police station to participate in a lineup. One of the officers slapped a walking stick on his own palm and leg. Carr became fearful and asked the defendant to go with the officers. On cross-examination, Carr testified that when the officers were in her home, no one got violent, the officers did not strike anyone, and the defendant was never handcuffed.

Patricia testified that on May 31, 1987, she had been a victim of aggravated criminal sexual assault. She was unable to identify anyone at the June 30, 1987, or August 25, 1987, lineups. At the lineup on August 29, 1987, she was the first of four women to view a lineup and identified the defendant as her attacker. She did not discuss the lineup with any of the other women.

Gayle testified that on June 15, 1987, she was a victim of home invasion. She viewed a lineup on July 30, 1987, and another on August 25, 1987, and was not able to identify anyone. On August 25, 1987, she viewed several photographs and identified the photograph of the defendant. On August 29, 1987, she was the second person to view a lineup and identified the defendant.

Paula testified that she was a victim of home invasion and attempted murder on June 15, 1987. At that time, she was living with Gayle. She viewed lineups on July 30, 1987, August 25, 1987,

and August 29, 1987. At the August 29 lineup, she identified the defendant.

Joan testified that on August 22, 1987, she was a victim of home invasion and aggravated criminal sexual assault. She was the last person to view the August 29, 1987, lineup. She identified the defendant as her attacker.

We first address the defendant's contention that the court erred in denying his motion to quash his warrantless arrest and suppress the lineup identification. The defendant first argues that on August 29, 1987, the officers did not have probable cause to arrest him.

Probable cause exists when the police possess enough evidence to lead a reasonable man to believe that a crime has been committed and that the defendant committed it. (*People v. Neal* (1985), 111 Ill. 2d 180, 489 N.E.2d 845.) The totality of the circumstances known to the police officers must be considered. (*People v. Montgomery* (1986), 112 Ill. 2d 517, 494 N.E.2d 475.) A reviewing court must not disturb the trial court's finding on probable cause unless it is manifestly erroneous. *People v. Reynolds* (1983), 94 Ill. 2d 160, 445 N.E.2d 766.

■■ Applying these principles, we conclude that the police had sufficient information to arrest the defendant. Between May 31 and August 22, 1987, three separate crimes involving home invasion and sexual assaults had been committed in the DePaul area. Four victims of these offenses had viewed various lineups in which the defendant was not a participant, and failed to identify the perpetrator. On August 25, 1987, one of the victims identified the defendant from a photo lineup. Considering the circumstances surrounding the crimes and the victim's identification of the defendant, we believe that at the time the officers arrested the defendant, probable cause existed to believe that a crime was committed and that the defendant committed the crime. Therefore, the trial court's finding of probable cause was not manifestly erroneous.

The defendant further argues that even if probable cause existed, the warrantless entry into his home without exigent circumstances or his consent made the arrest and subsequent lineup invalid. The defendant points to his testimony that he did not voluntarily accompany the officers to the police station. He bases his claim of error on *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371, which held that the fourth amendment prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest. The defendant argues that the lineup identification was

obtained as the product of such a warrantless entry and should be barred under the exclusionary rule.

■ We do not address whether the defendant consented to accompany the officers to the station in light of *New York v. Harris* (1990), 495 U.S. 14, 109 L. Ed. 2d 13, 110 S. Ct. 1640. The Court held that where the police had probable cause to arrest a suspect, the exclusionary rule did not bar the State's use of a statement made by the defendant outside of his home, even though the statement was taken after an arrest which was made in violation of *Payton*. While *Harris* refers only to "statements," the rule has been applied to other evidence obtained outside the home. (*People v. Alexander* (1991), 212 Ill. App. 3d 1091, 571 N.E.2d 1075.) As we have already stated that probable cause existed to arrest the defendant, we find that the court did not err in admitting evidence of the lineup identification even though the defendant was arrested without a warrant.

We also address the defendant's contention that since photographs of the lineup could not be developed because of inadvertent mechanical failure, testimony of the lineup identification should have been suppressed. The defendant argues that his efforts to show that the lineup was impermissibly suggestive were significantly inhibited by the absence of a photograph. The defendant specifically points to the fact that there is nothing in the record about the participants' complexions, hair styles, the extent of facial hair, or marks and scars.

■ We find the defendant's argument to be without merit. There is no due process violation in failing to photograph a lineup. (*People v. Kinzie* (1975), 31 Ill. App. 3d 832, 334 N.E.2d 872.) Moreover, the physical differences in participants do not make a lineup suggestive. (*People v. Williams* (1981), 96 Ill. App. 3d 958, 422 N.E.2d 199.) All of the victims testified as to the composition of the lineup and the defendant cross-examined each of them. There is nothing in the record to indicate that the photographs would have assisted the defendant in proving that the lineup was impermissibly suggestive. The court properly allowed the testimony of the witnesses as to their identification of the defendant in the August 29, 1987, lineup in the absence of a photograph.

At trial, Patricia testified that on May 31, 1987, she was asleep in her DePaul-area apartment when she was awakened in the middle of the night by a hand on her mouth. A man told her not to scream because he had a knife and he would kill her. He asked her if she had any money and she told him that she only had $18. The

man asked her where she kept the money. Patricia testified that at the time, it was getting light outside and the man's face was only 18 inches away from her. Patricia identified the defendant as the man in her apartment.

When she told the defendant that the money was in her purse in the living room, the defendant told her to get out of bed, not to look at him, and that he would follow her into the living room. The purse was in the kitchen and the defendant told her to give him the cash and go back into the bedroom. When she got to the bedroom, Patricia got back into bed, pulled the covers over her, and turned away from him and faced the wall. The defendant was standing next to the bed and unzipped his pants. He put his penis into her mouth. He asked her if she lived with anyone and she told him that she lived with a male person who would be returning shortly. The defendant told her to take her shirt off and tie it around her eyes. She removed her shirt and tied it around her eyes and the defendant led her into the living room. The defendant told her to lie on the floor of the living room and placed his penis in her vagina. The defendant got up and told her not to move or do anything for 20 minutes. He told her not to call the police because he lived in the neighborhood and he would know if she called them. After the defendant left, Patricia realized that the telephone in her kitchen had been unplugged. She plugged the telephone back into the kitchen wall and telephoned the woman across the street whom she had visited the night before and told her that she had just been raped. The woman came over and they walked to Grant Hospital. Patricia also noticed that a knife from her kitchen was next to where she had been lying on the floor in the living room.

Patricia testified that she viewed two lineups, one on July 30 and one on August 25, and did not identify anyone. At the August 29 lineup, she immediately identified the defendant as her attacker. She was the first person to view this lineup and did not discuss anything about the lineup with the other women who were also present that day.

Gayle testified that she was the victim of home invasion on June 15, 1987. At the time of the attack, she lived in the DePaul area and shared an apartment with Paula. She was asleep in her bedroom when she was awakened by heavy footsteps on the stairs which led to her bedroom. It was 4 a.m. She yelled out her roommate's name and a man ran towards her. He put his hand over her mouth and held a knife to her face. Gayle identified the defendant as the man who entered her apartment. The defendant told her not

to scream or he would kill her. He told her he just wanted her money. The defendant wanted to know if anyone else was home. When Gayle told him that her roommate was in the other bedroom, the defendant asked for a nylon to put over his face. Defendant took Gayle into Paula's room and asked for her money. He threatened to kill them if they looked at him. The defendant told them both to take their clothes off. He told Paula to tie her shirt over her eyes. Gayle told the defendant that her purse was in her bedroom and the defendant took Paula and Gayle to retrieve the purse. The defendant took $20 from Gayle's purse. They then went downstairs to retrieve Paula's purse. Paula ran to the door, unlocked it, and started screaming for help. The defendant grabbed Paula, told her he was going to kill her, threw her on the floor and stabbed her. When Gayle started screaming, the defendant ran out the door. As they went to call the police, they realized that the phone was unplugged. They also realized that the defendant had entered the apartment by removing burglar bars from the window. Gayle identified the defendant from a photo array on August 25 and identified the defendant in a lineup on August 29.

Paula testified that she lived with Gayle on June 15, 1987, when she was awakened at about 4 a.m. by a man with Gayle in her bedroom. She identified the defendant as the man who attacked her that morning. Her description of the events was essentially the same as Gayle's. Paula was hospitalized for eight days. She identified the defendant in a lineup on August 29, 1987.

Joan testified that she lived in the DePaul area. On August 22, 1987, in the early morning hours, she was awakened by a man lying on top of her. The man put his hand over her mouth, told her he had a knife and if she screamed, he would kill her. She identified the defendant as that man. The defendant asked her if she had any money and she told him that she had some in her purse. The defendant told her that if she looked at him he would kill her. The defendant found her purse and took the money. He then took all of the pillows off the bed and made Joan lie flat on her stomach with her hands on the wall. The defendant asked her how old she was and when she told him that she was 54, he asked her how she would like it if he shoved it up her back end. The defendant then told her that he was "just going to jag off" on her. The defendant could not maintain an erection. He led her into the living room and told her to lie flat on the floor because he was getting ready to leave. The defendant fumbled with the telephone, which was later found unplugged with the cord missing. He told her not to call the

police. The defendant left through the same window which he had entered and from which he had removed the bars. On August 29, 1987, Joan viewed a lineup in which she identified the defendant as her attacker. Each person in the lineup was asked to repeat the phrase, "You that old, I have to kill you." Joan identified the defendant by his appearance and through voice identification.

Detective Kurth testified that he conducted a lineup on August 29, 1987. There were five men in the lineup and Kurth gave a description of each of them.

Detective Hagen testified for the defense that he conducted a lineup on August 25, 1987. He showed a group of photographs to Paula and Gayle. Gayle selected the defendant's picture and Paula made no identification.

Annie Carr, the defendant's mother, testified that in August 1987, the defendant had a beard and his hair was short. From May 1987 until August 1987, the defendant never shaved off his beard or wore a different hair style.

On appeal, the defendant contends that he was denied a fair trial by the admission of extensive evidence of the other crimes committed against Gayle, Paula, and Joan. The defendant claims that the evidence was not so distinctive as to earmark them as the work of one person and, in any event, the prejudicial effect of the evidence outweighs its probative use.

*Modus operandi* means literally "method of working" and refers to a pattern of criminal behavior so distinctive that separate crimes are recognizable as the handiwork of the same doer. (C. McCormick, Evidence §190, at 448-49 (2d ed. 1972); *People v. Barbour* (1982), 106 Ill. App. 3d 993, 436 N.E.2d 667.) The crimes must be so nearly identical in method "as to earmark them as the handiwork of the accused." (C. McCormick, Evidence §190, at 449 (2d ed. 1972).) The relevance of the evidence arises from the fact that because the offenses share peculiar and distinctive common features, a logical inference is created that if the defendant was guilty of the other offenses, he may be guilty of the one charged. *People v. Anderson* (1982), 108 Ill. App. 3d 563, 439 N.E.2d 65.

In *People v. Tate* (1981), 87 Ill. 2d 134, 142-43, 429 N.E.2d 470, 475, our supreme court stated:

> "Although the similarities need not be unique only to the two offenses being compared, there must be present some distinctive features that are not common to most offenses of that type in order to demonstrate *modus operandi.*"

In *People v. Taylor* (1984), 101 Ill. 2d 508, 521, 463 N.E.2d 705, 712, our supreme court held that it was not error to admit evidence of the other crimes at issue because each crime occurred in the early evening hours, within a one-block area, within a four-day period of time. In each case the defendant was carrying what appeared to the witnesses to be the same gun, and the defendant was identified as the perpetrator in each incident.

There was clearly no distinctive feature to any of the court's cited similarities. However, the court stated that there were "a number of substantial similarities" between the three incidents and this was sufficient to qualify under the *modus operandi* exception. *Taylor*, 101 Ill. 2d at 521, 463 N.E.2d at 712.

In *People v. Phillips* (1989), 127 Ill. 2d 499, 522, 538 N.E.2d 500, 509, the court affirmed the admission of the other crimes under the *modus operandi* exception based upon the trial court's finding of 10 distinct areas of similarities between the crimes. The court stated that upon review of the record, "similarities were sufficient" to warrant the admission of the evidence.

Other cases have followed this trend and have held that to qualify as *modus operandi*, the similarities between the crimes should outweigh the dissimilarities, and "what is important is the similitude of the defendant's overall conduct in each instance." *People v. Bullock* (1987), 154 Ill. App. 3d 266, 271, 507 N.E.2d 44, 47; *People v. Watson* (1981), 98 Ill. App. 3d 296, 424 N.E.2d 329.

■ In the instant case, we find that there is no one distinctive feature to the crimes at issue as to constitute the handiwork of one man. However, in keeping with the current interpretation of the *modus operandi* exception, we believe that the crimes committed against Gayle, Paula and Joan were substantially similar to that committed against Patricia. All of the crimes occurred in the DePaul area of Chicago, within a short distance of each other. All of the crimes occurred within a three-month period of time. Each occurred in the early morning hours, between 4 a.m. and 5 a.m. In each case, the victim was awakened by the perpetrator either in her bedroom or, in the case of Gayle, approaching her bedroom. In each case, the perpetrator threatened the victim with a knife. In each case, the perpetrator asked the victim for her money before performing any sexual act. After defendant obtained each victim's money, she was either sexually assaulted or told to disrobe. In each case, the perpetrator unplugged the telephone in the victim's apartment. The defendant was identified in each case as the perpetrator.

We believe that based upon the number of substantial similarities between the crimes to the other women and the crime against Patricia, the evidence was relevant to the identification of the perpetrator in the instant case. Accordingly, we conclude that the evidence of the other crimes was properly admitted.

Nor do we agree with the defendant's assertion that the prejudicial effect of the evidence outweighed its probative value. As stated, we find the evidence probative of the defendant's identity. Any prejudicial effect was limited when the jury was specifically instructed that the other crimes evidence was received solely on the issue of "defendant's identification and design."

The defendant next contends that the prosecutor made five separate remarks during opening and closing arguments which denied him a fair trial. We only address one of the allegedly improper prosecutorial comments since the others were not objected to at trial or raised in his written motion for a new trial. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) The defendant did object to the statement made by the prosecutor during the opening statement in which the prosecutor quoted Paula as having said "I realized it was the nightmare I've always dreaded." The defendant's objection was overruled. The defendant argues that the prosecutor's characterization of the incident as a "nightmare" served only to arouse the fears and sympathy of the jury and, thus, denied him a fair trial.

We believe that the prosecutor's statement was properly based on the victim's testimony. Moreover, we cannot say that the use of the word "nightmare" either in the prosecutor's opening statement or in Paula's testimony was a material factor in the defendant's conviction, denying him a fair trial. *People v. Linscott* (1991), 142 Ill. 2d 22, 566 N.E.2d 1355.

The defendant next argues that in light of his defense of mistaken identification, the court committed reversible error in refusing his proposed non-IPI jury instruction on identification. The jury was given IPI Criminal 2d No. 1.02 (2d ed. 1981), which reads as follows:

> "You are the sole judges of the believability of the witnesses and of the weight to be given to the testimony of each of them. In considering the testimony of any witness, you may take into account his ability and opportunity to observe, his age, his memory, his manner while testifying, any interest, bias, or prejudice he may have, and the reasonableness of

his testimony considered in the light of all the evidence in the case."

The defendant's proposed instruction modified IPI Criminal 2d No. 1.02 and read as follows:

" 'You are the sole judges of the believability of the witnesses and of the weight to be given to the testimony of each of them. In considering the testimony of any of [sic] witness, you may take into account his ability and his opportunity to observe, his memory,' *** 'his degree of attention at the time of the offense, the accuracy of the witnesses [sic] earlier descriptions of the offender, his manner while testifying, any interest, bias, or prejudice he may have and the reasonableness of his testimony considered in the light of all the evidence in the case.' "

Essentially, the defendant's proposed instruction added two factors that the jury could consider: the degree of the witness' attention at the time of the offense, and the accuracy of the witness' earlier description. The defendant now argues that the absence of these two factors from the jury instruction was reversible error.

■■ This argument has been rejected by Illinois courts, and instead, IPI Criminal 2d Nos. 1.02 and 2.03 on credibility and burden of proof, respectively, have been held sufficient to instruct the jury as to the defense of mistaken identity. (*People v. Fox* (1971), 48 Ill. 2d 239, 269 N.E.2d 720.) In the instant case, the jury was given both IPI Criminal 2d Nos. 1.02 and 2.03. Furthermore, the defendant was allowed to thoroughly cross-examine the witnesses regarding their attention at the time of the offense and the accuracy of their earlier descriptions of their attackers. The defendant also vehemently argued both issues in his closing argument. Thus, we find this argument to be without merit.

■■ Next, the defendant contends that Gayle's reference to the photograph she viewed of the defendant as a "mug shot" apprised the jury of his prior criminal convictions, thus denying him a fair trial. Further, since the judge sustained the defendant's objection to her characterization of the photograph, the judge did nothing to alleviate the prejudice to the defendant. The defendant relies on *People v. Graham* (1989), 179 Ill. App. 3d 496, 534 N.E.2d 1382, in support of his argument. However, we note that in *Graham* there were "repeated and improper references to mug shots and mug books" along with other improper testimony which, in light of the entire record, sufficiently prejudiced the defendant to warrant a reversal of his conviction. (179 Ill. App. 3d at 509, 534 N.E.2d at

1391.) We do not believe the instant case is comparable. Gayle's single reference to the photograph as a "mug shot," in light of the entire record, cannot be said to have sufficiently prejudiced the defendant to have denied him a fair trial.

■■ The defendant argues that the cumulative impact of the numerous errors substantially prejudiced the defendant and denied him a fair trial. Since we have found no merit to any of the defendant's allegations of trial error, this argument must also fail.

Finally, the defendant raises two issues with regards to his sentencing: that his sentence was excessive and that the judge's inappropriate remark to the defendant's mitigating witness deprived him of a fair sentencing hearing.

At the sentencing hearing, Linda Storner testified that she had been the defendant's employer at a cleaning service from May until August 1987. Storner testified that the defendant did general cleaning and had keys to the buildings in which he cleaned. She stated that he was punctual, thorough, did heavy work, and supervised a mostly female crew. Additionally, she sometimes sent her 20-year-old daughter to drive him to and from work. On cross-examination, Storner testified that she was aware of the fact that the defendant had previously been convicted of theft, home invasion, and armed robbery and had been imprisoned.

At the end of her testimony, the judge stated, "All I have got to say to you is I hope you have got a lot of liability insurance. I am serious."

■■ We do not believe that the judge's remark to the witness indicates that the defendant did not receive a fair sentencing hearing. From our review of the record, it is apparent that the judge considered her testimony, the nature of the crime committed, and the fact that the defendant was a repeat offender.

■■ With regards to the judge's imposition of the 60-year sentence, the defendant argues that the sentence was excessive in light of his age, the fact that he was a high school graduate and has a 13-year-old son, was employed, and has no drug or alcohol problems. Additionally, the defendant contends that the sexual assault against Patricia was traumatic, but he "did not torture, brutalize, or attempt to kill her." The defendant concedes that the extended 60-year term was within the sentencing range for the crimes charged since in 1983, he pleaded guilty to home invasion, armed robbery, armed violence, and theft.

Absent an abuse of discretion, the sentence of the trial court may not be altered on review. (*People v. Perruquet* (1977), 68 Ill. 2d

149, 368 N.E.2d 882.) This great deference results from the fact that all factors to be considered in sentencing are better known to the trial court, which is in a superior position to evaluate the information afforded this court on a cold record. (*People v. Perruquet*, 68 Ill. 2d 149, 368 N.E.2d 882.) The trial court considered the nature of the offense, defendant's previous convictions for the same offenses, and heard the defendant's testimony at the sentencing hearing and that of his mitigation witness. We do not believe the court abused its discretion and find no basis for disturbing the sentence on appeal.

Accordingly, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

JOHNSON and McMORROW, JJ., concur.