# Illinois Official Reports

## Appellate Court

<div style="border:1px solid">

### *People v. Garcia*, 2017 IL App (1st) 142141

</div>

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EDWIN GARCIA, Defendant-Appellant. |
| District & No. | First District, First Division<br>Docket No. 1-14-2141 |
| Filed<br>Rehearing denied | March 6, 2017<br>March 21, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-CR-3129; the Hon. Nicholas Ford, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Benjamin Wimmer, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Margaret M. Smith, and Sean Enright, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE CONNORS delivered the judgment of the court, with opinion.<br>Justices Harris and Simon concurred in the judgment and opinion. |

**OPINION**

¶ 1    Defendant, Edwin Garcia, who was under 18 years of age at the time of his arrest, was charged with unlawful possession of a firearm and firearm ammunition (720 ILCS 5/24-3.1(a)(1) (West 2012)) after police made a warrantless entry into his home and subsequently performed a search of his person, which produced a gun. Officers had gone to defendant's home to arrest him on an unrelated misdemeanor complaint. Prior to trial, defendant's counsel filed a motion to quash arrest and suppress evidence, arguing that the gun seized from defendant was obtained through a warrantless entry into his home after the police entered without permission. The trial court denied the motion, finding that although defendant's constitutional rights had been violated, suppression was not warranted where the evidence was seized outside the home. After a bench trial, defendant was found guilty and subsequently sentenced to two years of intensive probation. Defendant appeals, arguing that the trial court erred in denying the motion to quash arrest and suppress evidence, because the evidence was obtained through exploitation of the officers' illegal warrantless arrest within defendant's home and was subject to the exclusionary rule. Alternatively, defendant argues that his counsel was ineffective for failing to impeach one of the officers regarding his testimony that he received permission to enter defendant's home. For the following reasons, we affirm the decision of the trial court.

¶ 2                                    BACKGROUND

¶ 3    Defendant was arrested on January 27, 2013, and charged by information with one count of unlawful possession of a firearm in violation of section 24-3.1(a)(1) of the Criminal Code of 2012 based on his possession of a firearm while under 18 years of age. 720 ILCS 5/24-3.1(a)(1) (West 2012).

¶ 4                 Motion to Quash Arrest and Suppress Evidence

¶ 5    On July 22, 2013, Defendant filed a pretrial motion to quash arrest and suppress the gun seized from him on the grounds that it was obtained through a warrantless entry into his home. The court held a hearing on defendant's motion on May 6, 2014. At the hearing, defendant presented the testimony of his brother Ruben Garcia, Jr., and his mother, Bonita Garcia.

¶ 6    Ruben testified that on January 27, 2013, he was at his then home, located at 4151 West 78th Place in Chicago, where he lived with his parents and brothers, one of whom is defendant. At the time the police arrived around 7 or 8 p.m., Ruben was watching TV in the living room with his mother, one of his brothers (not defendant), and his brother's friend. Ruben stated that he then heard knocking on the front door, which was right next to the TV. His mother then got up to answer the door and opened it about 10 inches to see who it was. Ruben testified that "when they asked [ ] for Edwin only, she just turned to call his name, but the thing is they barged in without any authorization." Ruben stated that the people on the other side of the door merely asked for Edwin and did not say anything else. He further testified that the people who came in were not in uniform and "dressed casual." Ruben called for defendant to come out of his room, where he was with his girlfriend, and at that point, he did not know the people who had entered the house were police. According to Ruben, after defendant came out of his room, the officers said they were going to ask defendant some questions; then the officers grabbed defendant and handcuffed him behind his back in the living room. Ruben stated that neither of

the two officers ever showed him a warrant, left a search warrant at the house, or told him they had a search warrant. After defendant was handcuffed, Ruben testified that the officers took defendant outside to their vehicle.

¶ 7 On cross-examination, Ruben testified that he was not the one who answered the door and allowed officers inside. Ruben also stated that he was unaware that defendant was a named offender in an armed robbery.

¶ 8 Bonita testified that on the evening of January 27, 2013, she was home with her children watching TV. When she heard the knock on the front door, she opened the door slightly and saw two people who then asked for defendant. She testified that they asked for Edwin before she opened the door. She, like Ruben, testified that when she turned to call for defendant, the officers came inside the house. Bonita testified that neither of the officers asked permission to come in the house and neither told her they were police before they entered. She testified that she "thought they were Edwin's friend. When my son went to call Edwin, then they said they were police officers and that they were going to ask him some questions, but at that moment they grabbed him, pulled him, and handcuffed him and they took him." Bonita stated that Edwin was handcuffed in the living room, the police searched him, and then they said they were taking him for questioning. Bonita also testified that neither of the men showed her a search warrant, told her they had a search warrant, or left any papers at her house.

¶ 9 On cross-examination, Bonita stated that although she was testifying with the help of an interpreter, she spoke some English and could understand what the English-speaking officers were saying that day. Bonita also testified that the officers searched defendant inside the home but that nothing was taken from him then. Bonita stated that she did not know that defendant was a named offender in an armed robbery. She also did not know whether the officers searched defendant after they took him outside the house.

¶ 10 The State presented the testimony of Officer Jeffrey Brouder, who testified that on January 27, 2013, at approximately 7:15 p.m., he was working "plain clothes tact" when he and his partner, Officer Silder, were assigned to an armed robbery investigation in which defendant had already been identified as a suspect. Officer Brouder testified that in furtherance of the investigation, he and Officer Silder went to defendant's home address. He further testified that when they arrived at defendant's home, "We knocked on the door and we were greeted by a family member. We asked if Edwin was home, he said yes." Officer Brouder stated that the "he" he was referring to was a younger male to whom he identified himself as a police officer and that defendant's mother did not come to the door with this younger male, whom Officer Brouder learned was defendant's brother. Officer Brouder stated that he told defendant's brother that they needed to speak to defendant and that "He invited us in and went and got his brother." Specifically, Officer Brouder testified that they asked if they could come in and defendant's brother said yes. The officer further stated that there were approximately six other people in the home, including defendant's mother and some friends. Officer Brouder stated that defendant was placed in custody in the front room in the presence of the other family members but they did not search defendant or ask him any questions on scene. Officer Brouder further stated that after defendant was placed in handcuffs, he was escorted to the officers' vehicle "where a custodial search was conducted before we put him in the back of the car." The officer testified that the search revealed a handgun.

¶ 11 On cross-examination, Officer Brouder stated that neither of the reports he prepared in this case made any reference to who answered the door. Officer Brouder also stated that they were

acting on signed criminal complaints but did not have a search warrant or arrest warrant. He also stated that he never saw the complaints. Officer Brouder testified that, "the victim [of the armed robbery] stated that he did not want to proceed with felony complaints for the robbery and signed for a misdemeanor battery and a theft."

¶ 12 The parties then argued the motion. The State conceded that this was a warrantless entry into a home but argued that the officers had probable cause to arrest this defendant because "he was a named offender in an armed robbery." The State recognized that the testimony conflicted regarding who answered the door and whether permission to enter was given but contended that the police were more credible because the family was biased. Thus, the State asserted that the recovered handgun should not be suppressed because the exclusionary rule does not apply for warrantless entries into homes where probable cause exists and where the evidence is obtained outside the home. The defense argued that because the officer had never seen the complaints and they were not present in court, it was impossible to know what they stated. Further, defense counsel asserted that officers could not enter defendant's home to arrest him on a misdemeanor, which was the charge he ultimately faced.

¶ 13 When delivering its ruling, the court acknowledged, "Obviously there is a real divergency in what happened in this case." The court went on to note that it did not find the story of defendant's family to be "plausible" and that "The brother's version of the event was a little bit different than [the mother's]." Ultimately, the court opined:

> "One point I wanted to identify specifically is the mother indicated that they asked for Edwin through the door, on the outside of the door and then she opened it. It's kind of moot. I really believe that *Payton* requires that the officers may not make an arrest within the home in the absence of an arrest warrant. I believe under *New York v. Ferris*, in his circumstance we have a violation of the defendant's [c]onstitutional [r]ights that does not lead to the suppression of the evidence that was seized outside the home. That's because the recovered evidence in this case was recovered from the defendant's person after the arrest in the home. Therefore, the evidence will not be suppressed."

¶ 14 The case then proceeded to a bench trial.

¶ 15 Bench Trial

¶ 16 Defendant waived his right to a jury trial, and his bench trial proceeded immediately following the hearing on the motion to quash arrest and suppress evidence on May 6, 2014. The parties stipulated to the admission of the testimony given by Ruben, Bonita, and Officer Brouder at the suppression hearing.

¶ 17 The State additionally called Officer T. Silder,[1] who testified that on the evening in question, he and his partner, Officer Brouder, "were going to look for a named offender in an armed robbery case." He stated that the named offender was "Edwin Garcia." Officer Silder specifically stated that he and his partner went to defendant's home, located at 4151 West 78th Place in Chicago, and, "We knocked on the door. We were met by another person who turned out to be a family member and we were let inside." The officer testified that the person who opened the door was male. They then asked for defendant. Officer Silder testified that he could not recall if defendant was "right there" or if someone had to go get him. Thereafter, defendant

---

[1]Officer Silder's first name does not appear in the record on appeal.

- 4 -

was placed in custody in the living room. Officer Silder testified that he had identified himself as a police officer before entering the house. He further stated that after exiting the home, but before placing defendant in their vehicle, he performed a search of defendant and recovered a six-shot .32 caliber revolver handgun. Officer Silder indicated that the recovered handgun was approximately four to five inches in length. He further stated that, "Once we were in the vehicle after *Miranda*, he said he carries the gun for protection because his house just got shot up." On cross-examination, Officer Silder testified that he did not search defendant while in the house. Also, he confirmed that the handgun was already in defendant's pocket when the officers walked him outside.

¶ 18    The State introduced defendant's birth certificate into evidence, which indicated that he was born on June 12, 1995, and then rested its case. The defense then made a motion for directed finding, which was denied.

¶ 19    For the defense's case-in-chief, defendant testified on his own behalf. He stated that on January 27, 2013, he was in his bedroom when he heard his mother and brothers screaming his name. Not knowing the police were there, he went into the living room and was arrested. Defendant testified that the officers first searched him and then placed him in handcuffs. Defendant admitted to having a gun in his pocket when he left the bedroom because, he stated, "I heard shouting and I got paranoid because I got bullet holes that's all over through my windows." Defendant stated that the officers did not find anything on him in the house because his pants sagged. He further stated that his girlfriend tried to remove the gun from his pocket after the police placed him in handcuffs, but defendant told her to stop because the police were watching. Defendant testified that when the officers walked him down the stairs, they asked what his girlfriend was grabbing in his pocket. He stated that once he was by the officers' vehicle, one of the officers went through his pockets and pulled the gun out. Defendant told the officers it was for protection.

¶ 20    During closing arguments, the defense argued that defendant was engaged in lawful activity by possessing a gun in his own home for protection, because the statute under which defendant was charged does not apply to recreational activity with firearms, such as, but not limited to, shooting at targets, hunting, fishing, or trapping. Defense counsel argued that defendant's conduct fell under the "but not limited to" portion of the statute. The State argued that the law does not allow anyone under the age of 18 to possess a gun in the home. The State asserted that the officers did not go into defendant's home looking for the gun but instead went in based on probable cause because defendant was named in an armed robbery. The State pointed out that defendant had admitted to every element of the crime.

¶ 21    The court ultimately found defendant guilty, stating:

> "I don't know what redress [defendant] could have hoped for. There's some indication that he could have been using [the gun] to protect himself. I don't find that he falls within the exceptions enumerated under the UUW statute. I've already indicated they couldn't go into the house and arrest him, but by the defendant's own admission now, the gun recovered on the outside was already in his pocket. There will be a finding of guilty."

¶ 22    On May 30, 2014, defendant filed a motion for a new trial, arguing, *inter alia*, that the court erred in denying defendant's pretrial motion to quash arrest and suppress evidence. On that same date, the court denied defendant's motion for new trial and sentenced defendant to two years' intensive probation.

¶ 23    Defendant filed his timely notice of appeal on June 24, 2014.

¶ 24                                    ANALYSIS

¶ 25    On appeal, defendant contends the trial court erred in denying his motion to quash arrest and suppress evidence because the evidence was obtained through exploitation of the illegal warrantless arrest within his home and is therefore subject to the exclusionary rule. Defendant asks this court to reverse his conviction outright. In the alternative, defendant argues that his counsel was ineffective in failing to impeach Officer Brouder's testimony that he received consent to enter defendant's home.

¶ 26                      Motion to Quash Arrest and Suppress Evidence

¶ 27    The fourth amendment to the United States Constitution ensures "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. We apply a two-part standard of review when reviewing a ruling on a motion to quash arrest and suppress evidence. *People v. Grant*, 2013 IL 112734, ¶ 12. "While we accord great deference to the trial court's factual findings, and will reverse those findings only if they are against the manifest weight of the evidence, we review *de novo* the court's ultimate ruling on a motion to suppress involving probable cause." *Id.*

¶ 28    A defendant bears the burden of proof on a motion to suppress evidence. *People v. Cregan*, 2014 IL 113600, ¶ 23. "If the defendant makes a *prima facie* showing that the evidence was obtained in an illegal search or seizure, the burden shifts to the State to provide evidence to counter the defendant's *prima facie* case." *Id.* However, the ultimate burden of proof lies with the defendant. *Id.*

¶ 29    Defendant argues that the trial court erred in denying his motion to quash arrest and suppress evidence because the handgun recovered from his pocket was only recovered through "exploitation of the illegality" of the police officers' unconstitutional entry into his home. In response, the State asserts that the trial court properly denied defendant's motion to suppress where the arresting officer had probable cause to arrest defendant and where the evidence was recovered outside of defendant's home.

¶ 30    In *Payton v. New York*, 445 U.S. 573, 602-03 (1980), the United States Supreme Court held that warrantless entry by police officers into a defendant's residence to make a routine felony arrest in the absence of consent or exigent circumstances violated the defendant's fourth amendment right to be free from unreasonable search and seizure. Ten years later, in *New York v. Harris*, 495 U.S. 14, 16 (1990), the Court again addressed the warrantless entry of police officers into a defendant's home, examining the issue of whether a statement made by a defendant outside of the home should have been suppressed because the police, by entering defendant's home without a warrant and without consent, violated *Payton*. The Court concluded that the defendant's statement should not be suppressed even though arresting the defendant in his home without a warrant was a violation of *Payton* because "the rule in *Payton* was designed to protect the physical integrity of the home; it was not intended to grant criminal suspects, like Harris, protections for statements made outside their premises where the police have probable cause to arrest the suspect for committing a crime." *Id.* at 17.

¶ 31    Defendant does not dispute that the police had probable cause to effectuate his arrest. Rather, he argues that suppression is proper because the recovered handgun was obtained

through "exploitation of the illegality" of the officers' decision to illegally enter defendant's home and therefore should have been suppressed. See *Hudson v. Michigan*, 547 U.S. 586, 592 (2006) (the relevant question is " 'whether, granting establishment of the primary legality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint' " (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963))).

¶ 32     The State primarily relies on *People v. Alexander*, 212 Ill. App. 3d 1091 (1991), and *People v. Houston*, 240 Ill. App. 3d 754 (1992), as support for its position. In *Alexander*, this court first addressed the Supreme Court's decision in *Harris* and reiterated the *Harris* holding that " 'where the police have probable cause to arrest a suspect, the exclusionary rule does not bar the State's use of a statement made by the defendant outside of his home, even though [that] statement is taken after an arrest made in the home in violation of *Payton*,' " because "as long as the police have probable cause for holding the suspect in custody, such statements are neither 'the product of being in unlawful custody *** [nor] the fruit of having been arrested in the home rather than someplace else.' " *Alexander*, 212 Ill. App. 3d at 1104 (quoting *Harris*, 495 U.S. at 19). This court went on to decide that although *Harris* only referred to statements obtained outside the home, "we see no reason why the rule it enunciates should not apply as well to other evidence obtained outside the home, as the argument for excluding statements was that they were the fruits of an illegal arrest rather than that there was some basis for distinguishing between statements and other evidence." (Internal quotation marks omitted.) *Id.* As a result, this court held that because the defendant did not deny the existence of probable cause for his arrest, the trial court did not err in admitting the evidence obtained from the defendant away from his home after his arrest. *Id.* at 1104-05.

¶ 33     In *Houston*, the defendant argued that a lineup identification was obtained as the product of a warrantless entry into his home and should be barred under the exclusionary rule even if the officers had probable cause for his arrest. *Houston*, 240 Ill. App. 3d at 759-60. Recognizing that the *Harris* rule regarding statements had been applied to other evidence obtained outside the home, the court disagreed with the defendant's argument and held that where probable cause existed, "the court did not err in admitting evidence of the lineup identification even though the defendant was arrested without a warrant." *Id.* at 760.

¶ 34     Defendant argues that the decisions in *Alexander* and *Houston* are "likely inconsistent with *Harris*," as they depend on the conclusion that a lineup identification or fingerprint identification was obtained outside the home, where in each case the defendant was arrested inside the home. We do not find defendant's argument convincing because both *Alexander* and *Houston* were decided after *Harris* and relied on *Harris* in reaching their holdings. In the alternative, defendant argues that even assuming these two cases were correctly decided, they are distinguishable because both dealt with evidence that "consisted of the defendant's body—his appearance and his fingerprints—rather than personal property." Defendant does not point to, and we have not found, any support for the proposition that whether evidence should be suppressed in such a situation turns on the relatedness of the evidence to a defendant's body. We agree with defendant that *Harris* requires the suppression of "the fruit having been arrested in the home rather than someplace else." *Harris*, 495 U.S. at 19. However, neither this court nor our supreme court has interpreted this to signify that the test defendant proposes is proper. Rather, this court has previously recognized, on at least two occasions, that the rule from *Harris* regarding statements has been applied to other evidence

obtained outside the home, even going so far as to say that "we see no reason why the rule [*Harris*] enunciates should not apply as well to other evidence obtained outside the home." *Alexander*, 212 Ill. App. 3d at 1104.

¶ 35   Defendant further relies on the holding from *Harris*, which stated, "For Fourth Amendment purposes, the legal issue is the same as it would be had the police arrested [the defendant] on his doorstep, illegally entered his home to search for evidence and later interrogated [the defendant] at the station house." *Harris*, 495 U.S. at 18. However, what defendant misses is that the facts of the case at bar mirror those of *Harris*. Here, if the officers would have arrested defendant on his doorstep and then illegally searched for evidence, the result would have been the same because the gun was in defendant's pocket. Thus, like in *Harris*, because the officers had probable cause, defendant was not unlawfully in custody when he was removed from his home and searched before being placed into the officers' vehicle. See *id.* ("Because the officers had probable cause to arrest [the defendant] for a crime, [the defendant] was not unlawfully in custody when he was removed to the station house, given *Miranda* warnings, and allowed to talk.").

¶ 36   We likewise find unconvincing the cases upon which defendant relies: *People v. Spicer*, 163 Ill. App. 3d 81 (1987), and *People v. Santovi*, 2014 IL App (3d) 130075. First, we find *Spicer* to be of inadequate support for defendant's position because it was decided three years prior to *Harris*. Further, we find *Santovi* to be unconvincing because that case does not involve an issue similar to the one at bar. In *Santovi*, the State appealed the trial court's decision to grant suppression where, although the officers' initial entry into defendant's home was consensual, the defendant was effectively under arrest at the time the officer threatened to kick down the bathroom door. *Id.* ¶ 4. Additionally, the *Santovi* decision does not mention the *Harris* case or its progeny, which are crucial to the case at bar.

¶ 37   As a result, we find the cases cited by the State to be more convincing. Here, defendant, like the defendant in *Alexander*, does not dispute that probable cause existed for his arrest. Thus, according to *Alexander* and *Houston*, we find that where officers had probable cause to effectuate defendant's arrest, and while their entry into his home to do so was unlawful under *Payton*, the evidence recovered outside his home is not required to be suppressed. The trial court properly denied defendant's motion to quash arrest and suppress evidence.

¶ 38                               Ineffective Assistance of Counsel

¶ 39   In the alternative, defendant argues that assuming the trial court had found that the police received permission to enter defendant's home, and even assuming such a finding would not be contrary to the manifest weight of the evidence, reversal would be required. In response, the State points out that the trial court did not make a finding that the officers received permission to enter defendant's home and asserts that defendant's request that this court "assume" that the trial court found facts that it did not is improper. We agree with the State.

¶ 40   As our supreme court has consistently recognized, "Courts of review will generally not decide questions which are abstract, hypothetical, or moot." *In re James W.*, 2014 IL 114483, ¶ 18. Similarly, Illinois courts do not render advisory opinions. See *In re Alfred H.H.*, 233 Ill. 2d 345, 351 (2009).

¶ 41   Here, both parties agree that the trial court did not make a finding that the police received permission to enter defendant's home. Thus, we decline to examine whether defendant's counsel would have been rendered ineffective for failing to impeach Officer Brouder with his

arrest report, because there is no evidence in the record, and the parties do not suggest, that the trial court made a finding regarding permissive entry that would allow us to review such an issue. Specifically, in his reply brief, defendant states that "the State concedes that the trial court did *not* find that the police had consent to enter [defendant's] home prior to his arrest. Given that concession, [defendant's] claim in the alternative is beside the point." This statement by defendant, coupled with the fact that we do not render advisory opinions or make decisions based upon hypotheticals, renders our review of defendant's alternative issue unnecessary. See *In re James W.*, 2014 IL 114483, ¶ 18; *In re Alfred H.H.*, 233 Ill. 2d at 351.

¶ 42                                                    CONCLUSION

¶ 43    Based on the foregoing, we find that the trial court properly denied defendant's motion to quash arrest and suppress evidence. Therefore, we affirm the judgment of the circuit court.

¶ 44        Affirmed.