NO. 5-97-0206

IN THE 

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_________________________________________________________________

THE PEOPLE OF THE STATE OF ILLINOIS,   )  Appeal from the 

                                       )  Circuit Court of 

     Plaintiff-Appellee,               )  Monroe County.

                                       )  

v.                                     )  No. 96-CF-85

                                       )

JAMES F. BURNFIELD,                    )  Honorable

                                       )  Jerry D. Flynn, 

     Defendant-Appellant.              )  Judge, presiding.  

_________________________________________________________________

JUSTICE RARICK delivered the opinion of the court:  

James F. Burnfield was convicted in the circuit court of Monroe County with one count of aggravated kidnapping and two counts of aggravated criminal sexual assault, all arising out of an attack on H.D.  Prior to trial, Burnfield filed a motion to suppress a confession, arguing that he had requested an attorney but the police refused to make one available and continued to question him in spite of his request for an attorney.  A hearing was held on January 21, 1997.  According to Deputy Dennis Schrader, one of the arresting officers, when Burnfield was arrested, he was advised that he was suspected of kidnapping and rape.  He was also read his 
Miranda
 rights (
Miranda v. Arizona
, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1996)).  According to Schrader, Burnfield stated, "If I'm going to be charged with rape[,] maybe I should talk to an attorney."  The officers asked no more questions.  At the conclusion of Schrader's testimony, both the State and defense counsel stipulated that Officer Michael Douglas, the other arresting officer, would testify as Schrader had.  Later that day Sheriff Kelley spoke with Burnfield at the Monroe County jail.  After again being informed of his 
Miranda
 rights, Kelley began questioning Burnfield.  At no time did Burnfield ask that the questioning be stopped or that he be allowed to speak with an attorney.  At one point Burnfield said, "Maybe I should talk to an attorney."  Kelley responded by telling Burnfield that he probably should talk to an attorney because he was facing serious charges.  After a brief period of silence during which Kelley began to gather some papers, Burnfield said, "I didn't even have sex," and continued the conversation.  Kelly then proceeded with the interrogation.

The trial court denied Burnfield's motion to suppress, finding that he did not make an unequivocal demand for counsel and that even if he had, he voluntarily continued the conversation with police after they had stopped questioning him.

Burnfield also testified at the hearing.  He denied using the word "maybe" and said that he told the officers very specifically that he should have a lawyer and that if they were trying to charge him with rape, he did not want to talk to them.

At trial, Bonnie Hoffman testified that she and her husband, James, lived in Waterloo, Illinois, across a highway from a cornfield, approximately one quarter of a mile from the Monroe County Fairgrounds.  At about 12:30 or 1 a.m. on the morning of August 3, 1996, she heard the doorbell ring and went to answer it.  At the door she found a young woman who was naked, with her hair tousled and her lip swollen with a cut.  The woman, who identified herself as H.D., was frightened and said, "[T]hey are trying to kill me."  Her eyes were red and her hands and fingernails were dirty.  While James called the police, Hoffman obtained a sheet for H.D. to cover herself.

Michael Douglas, a Waterloo police officer, testified that on August 3, 1996, he was dispatched to the Hoffman residence.  When he arrived, he found H.D. sitting in a chair in the living room.  She was crying hysterically and her face was bloodied and dirty.  H.D. told Douglas that "some people" had attacked her and that she had been taken from the fairgrounds by "three or four guys" to a wooded area.

Susanne Sweet, also a Waterloo police officer, was dispatched to the Hoffman residence to assist Douglas.  Sweet found H.D. seated on a chair and wrapped in a sheet.  H.D. was bloody and bruised and had a cut lip.  She was covered with dirt and leaves and was crying.  Sweet repeatedly asked H.D. what had happened, but H.D. made little response.  Sweet then asked H.D. if she had been raped, and H.D. indicated that she had.  H.D. indicated that she did not know who attacked her, but she described him as being thin with brown hair and a moustache.  She also remembered hearing the name "Shotzy."  Sweet testified that "Shotzy" was a nickname for a man named Brian Weltig, whom she described as being thin with brown hair and a moustache.  During the ambulance ride to the hospital, H.D. told Sweet that there were about three people involved but that only one had actually struck her and raped her.  Sweet also stated that she could smell liquor on H.D.'s breath.

Sergeant James Trantham of the Waterloo Police Department testified that he was on duty at the Monroe County Fair on the night of August 2, 1996.  At approximately 11:30 p.m. Trantham encountered Burnfield.  At Trantham's request, Burnfield showed Trantham his driver's license, which he produced from his wallet.  After speaking with Burnfield for a few minutes, Trantham escorted him to the east side of the fairgrounds near the ferris wheel and told him to leave.  Trantham watched as Burnfield walked past the fairgrounds into the dark.

Robert Young, a deputy with the Monroe County Sheriff's Department and the unit's canine handler, testified that around 1:40 a.m. on August 3, 1996, he was called to assist the Waterloo Police Department in searching the roads and fields adjacent to the Monroe County Fairgrounds for a possible crime scene.  At around 2:50 a.m. the dog located a wallet and comb.  The area was secured and a crime-scene technician was called.

Patricia Young, a crime-scene investigator for the Illinois State Police, testified that in the early morning of August 3, 1996, she was called to Waterloo to examine a crime scene.  She noted that cornstalks had been knocked down in two areas, about 10 feet apart.  The wallet located by Deputy Young contained an Illinois driver's license with the name James F. Burnfield, two social security cards (one of which bore the name of James F. Burnfield), two credit cards, some photographs and business cards, and a grocery store customer card with the signature "J.J. Burnfield" on the back.

Later that day Jackson spoke with H.D. at H.D.'s home.  H.D.'s eyes were swollen and discolored, as was the left side of her face.  She had discoloration and scratch marks on her back and on both arms, bruises and discoloration on her knees, and a human bite mark on the right side of her abdomen.  Jackson also searched Burnfield's residence.  There she found a pair of blue jeans and a striped shirt, both of which were damp and covered with mud.  The shirt also had what appeared to be blood on the front.

Sheriff Kelly testified that he questioned Burnfield on the afternoon of August 3, 1996, at the Monroe County jail.  Present at the time was Deputy Schrader.  When asked if he had had any contact with a woman at the fair, Burnfield indicated that the only woman he had spoken with had a name tag that read "Angie."  He was subsequently ejected from the fair by a couple of police officers.  He then left, walking east along Highway 156 toward Waterloo, where he lived.  He went through a cornfield, across the cemetery, and to his apartment.  The route Burnfield described was in the vicinity of the crime scene the police had investigated.  When Kelly asked Burnfield where his wallet was, Burnfield stated that it was in his apartment.  When Kelly informed Burnfield that it had been found at the crime scene on top of the victim's clothes, Burnfield hesitated and then said, "I didn't even have sex."  Burnfield then stated that he had met a young lady walking along the highway, that she was crying, and that they agreed to go into the cornfield and have sex.  She changed her mind and he struck her.  He then got up and went home.

H.D. testified that she attended the Monroe County Fair on August 2, 1996, with two friends.  She drank several beers prior to going to the fair and drank a beer at the fair.  When she became separated from her friends, she left the fair and walked along Highway 156 toward Waterloo, where her car was parked.  Shortly after beginning her walk, she was grabbed from behind by a man, was dragged into a cornfield, and was repeatedly bit on the hand and stomach.  When asked whether she could see her attacker, H.D. testified that it was dark and she described the man as thin with a moustache and black or dark hair.  H.D. never saw more than one attacker and was unsure why she thought there had been more than one.  Her attacker ordered her to remove her shirt and bra and then pulled off her jeans and underwear.  While holding her on the ground, he placed his penis in her mouth, bit her abdomen, and placed his penis in her vagina.  H.D. was able to free herself and ran to a nearby house.  The woman there gave her a sheet to cover herself and then called for the police and an ambulance.  At first, H.D. thought that Brian Weltig, nicknamed "Shotzy," had attacked her because of the physical similarity between Weltig and her attacker.  Nevertheless, she specifically identified Burnfield as her assailant.

Dennis Aubuschon, an Illinois State Police forensic biologist, testified that his testing of H.D.'s clothing and vaginal and oral swabs from H.D. did not reveal the presence of any semen.  He testified that this was not inconsistent with vaginal or oral penetration.  He also testified that a substance on H.D.'s shirt tested positive for blood. 

Terry Snodgrass testified that on August 3, 1996, he transported H.D. to the hospital.  During the ride H.D. stated that she had been beaten by several people and had been sexually assaulted.

James Burnfield testified that he had attended the Monroe County Fair on August 2, 1996.  After being asked to leave by police officers, he was walking along Highway 156 when he encountered H.D.  She was crying, staggering, upset, clearly intoxicated, and angry at her boyfriend.  They agreed to go into a nearby cornfield.  H.D. took off her clothes.  While "making out", Burnfield also removed his clothes.  He placed himself on top of H.D., kissed her face and body, and began performing a sex act on her.  At no time did H.D. say no or otherwise object.  He denied placing his penis in H.D.'s mouth but admitted biting her.  When H.D. refused to have intercourse, Burnfield began to lift himself off of her.  At that point H.D. kneed him in the groin.  She began fighting with him, and he struck her five times.  Burnfield testified that he initially refrained from telling police about the encounter with H.D. because he feared being charged with assault.  At first he denied telling Sheriff Kelly that he struck H.D. because she refused his sexual advances, but then he stated that he did not remember whether he had made that statement.

The jury returned a verdict of guilty of aggravated kidnapping and two counts of aggravated criminal sexual assault.  The trial court subsequently vacated the guilty verdict on one count of aggravated criminal sexual assault.  Burnfield was sentenced to consecutive terms of 10 years' imprisonment on the remaining count of aggravated criminal sexual assault and on the aggravated kidnapping count.

On appeal, Burnfield argues that the trial court erred in denying his motion to suppress his confession because it was elicited in violation of his right to counsel.  Burnfield maintains that the evidence demonstrates that he made an unequivocal demand for an attorney and that the police refused his demand and continued with their interrogation.

Initially, we must address the State's contention that Burnfield waived this argument by failing to include it in a posttrial motion.  Generally, the failure to challenge the admission of a confession at trial either by a motion to suppress or by an appropriate objection at trial and then by a posttrial motion will waive appellate review of the issue.  
People v. Miles
, 188 Ill. App. 3d 471, 544 N.E.2d 986 (1989).  In the present case Burnfield filed a motion to suppress, and an evidentiary hearing was held thereon.  He also made an appropriate objection at trial, but he failed to include the issue in a posttrial motion.  In 
People v. Alexander
, 212 Ill. App. 3d 1091, 571 N.E.2d 1075 (1991), the defendant filed a pretrial motion to suppress his confession, which was denied after a hearing, but he failed to include the issue in a posttrial motion.  The court held that this was insufficient to preserve the issue for review.  In 
People v. Torres
, 283 Ill. App. 3d 281, 669 N.E.2d 1279 (1996), the defendant likewise filed a pretrial motion to suppress, but he failed to include the issue in a posttrial motion.  The court in 
Torres
 held that while a technical waiver existed, the written motion to suppress and resultant evidentiary hearing was sufficient to preserve the issue for appellate review.  We find that the 
Torres
 approach is the better one and that Burnfield's motion to suppress was sufficient to preserve the issue for review.  

Turning to the merits of Burnfield's argument, the question of whether a defendant has made a request for counsel is a factual one, and the trial court's determination thereof will not be disturbed on review unless it is contrary to the manifest weight of the evidence.  
People v. McDaniel
, 164 Ill. 2d 173, 647 N.E.2d 266 (1995).  As the trier of fact in a suppression hearing, it is the function of the trial judge to determine the credibility of the witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence.  
People v. Perkins
, 248 Ill. App. 3d 762, 618 N.E.2d 1275 (1993).  Where the evidence is merely conflicting, the reviewing court will not substitute its judgment for that of the trial court.  
People v. Spivey
, 209 Ill. App. 3d 584, 568 N.E.2d 327 (1991).

When a suspect requests counsel, all interrogation must cease and the accused may not be approached for further interrogation until counsel has been made available to him.  
Edwards v. Arizona
, 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880 (1981).  If the police do subsequently initiate an encounter in the absence of counsel (assuming there has been no break in custody), the accused's statements are presumed to have been made involuntarily and are therefore inadmissible at trial, unless the State can demonstrate that the accused initiated further discussions with police and knowingly and intelligently waived the right he had invoked.  
People v. Winsett
, 153 Ill. 2d 335, 606 N.E.2d 1186 (1992).  

In order to be effective, however, the request for counsel must be clear and unambiguous.  In 
Davis v. United States
, 512 U.S. 452, 129 L. Ed. 2d 362, 114 S. Ct. 2350 (1994), the Supreme Court held that the statement "[m]aybe I should talk to a lawyer" did not constitute an unambiguous and unequivocal request for counsel and that the authorities therefore were not required to stop questioning the petitioner.  Our supreme court likewise has held that statements such as "maybe I should talk to an attorney" or "should I see a lawyer?" are not sufficiently clear and unequivocal to invoke the right to counsel and to require the authorities to stop an interrogation.  
People v. Oaks
, 169 Ill. 2d 409, 662 N.E.2d 1328 (1996);  
People v. Krueger
, 82 Ill. 2d 305, 412 N.E.2d 537 (1980). 

In the present case Sheriff Kelly and Deputy Schrader both testified that Burnfield stated that "maybe" he should talk to an attorney.  Although Burnfield maintained that he unequivocally demanded an attorney, the trial court found the officers' testimony more credible.  Burnfield argues that while the officers testified that he used the word "maybe", they also testified that after his statement concerning an attorney they ceased questioning him.  Burnfield contends that the officers' reaction to his statements demonstrated that they were aware that he was invoking his right to counsel.  Although it would have been permissible for the trial court to draw that inference, it did not do so, and it is not the proper role of this court to substitute our own inferences for those drawn by the trier of fact.  

Even if we were to hold that Burnfield had properly invoked his right to counsel, it was Burnfield himself who continued the conversation after police stopped questioning him.  He also admitted that he read, understood, and signed a form indicating that he had been informed of his rights and that he understood them.

Finally, any error in admitting Burnfield's subsequent statements was harmless beyond a reasonable doubt.  The admission into evidence of an improper confession is subject to harmless error analysis.  
People v. Mitchell
, 152 Ill. 2d 274, 604 N.E.2d 877 (1992).  Whether the error is harmless depends upon the circumstances of each case.  
People v. Traina
, 230 Ill. App. 3d 149, 595 N.E.2d 635 (1992).  An error is considered harmless where the reviewing court can conclude that absent the error the outcome of the trial would not have been different.  
People v. Carlson
, 224 Ill. App. 3d 1034, 586 N.E.2d 1368 (1992).

In the present case, H.D. testified that when she left the fair she was attacked, was dragged into a cornfield, and was sexually assaulted.  She escaped and ran to a nearby house.  Bonnie Hoffman testified that when she answered the doorbell, she found a young woman naked, dirty, bleeding, and hysterical.  The woman claimed that she had been sexually assaulted.  Burnfield had been ejected from the fair shortly before the attack on H.D.  Burnfield's wallet was found at the scene of the assault.  A search of Burnfield's apartment produced a pair of jeans and a shirt, both of which were damp and covered with mud.  The shirt had blood on it.  Finally, H.D. specifically identified Burnfield as her attacker.  Reviewing the record, we find that there is overwhelming evidence to support Burnfield's conviction.

For the foregoing reasons, the judgment of the circuit court of Monroe County is affirmed.

Affirmed.  

WELCH, P.J., and MAAG, J., concur.