## Commonwealth *vs.* Edward Street.

No. 00-P-1523.

Middlesex. April 4, 2002. - October 25, 2002.

Present: Jacobs, Dreben, & Green, JJ.

*Constitutional Law,* Search and seizure. *Search and Seizure,* Motor vehicle, Automobile, Clothing, Exigent circumstances, Inevitable discovery. *Evidence,* Testimony before grand jury, Prior inconsistent statement.

The judge in a criminal action properly denied the defendant's motion to suppress evidence seized from an automobile, where the police had probable cause to believe that the automobile seized had been involved in the incident under investigation and therefore was likely to contain or otherwise provide evidence of the crimes, and the car was parked in a public place and was apparently capable of being moved; given the mobility of such a vehicle, no further exigency was required to justify the warantless seizure. [303-305]

No exigent circumstances existed to justify a criminal defendant's warrantless arrest, and the arrest was therefore illegal; however, because the police had probable cause to arrest the defendant, the fact that the arrest was illegal did not require the suppression of the defendant's pants and sneakers, which police took from the defendant at the police station after the arrest, in that the continued custody of the defendant after removal from his home was lawful. [305-309]

The judge at a criminal trial did not err in denying the defendant's request to read a portion of the victim's prior grand jury testimony, where the testimony that the defendant sought to introduce was collateral to all issues in the case, save the victim's credibility, and therefore could not, of right, be used to contradict the victim's testimony at trial. [309-310]

INDICTMENTS found and returned in the Superior Court Department on June 26, 1996.

Pretrial motions to suppress evidence were heard by *Raymond J. Brassard,* J., and *R. Malcolm Graham,* J., and the cases were tried before *Maria I. Lopez,* J.; a second trial on the indictments charging rape and assault with intent to rape was had before *Sandra L. Hamlin,* J.

*Robert L. Sheketoff* for the defendant.

*Esther M. Bixler*, Assistant District Attorney, for the Commonwealth.

DREBEN, J. On the evening of June 4, 1996, while sitting with her friend James in his Chevrolet Camaro automobile in a parking lot near Mystic Lake in Medford, sixteen year old Harriet[1] was forced from the car. Her assailant said he had a gun, slapped her in the face, and demanded her money. Shortly thereafter, a second assailant grabbed her, lifted her by the waist, and carried her to the woods. Unsuccessful in his attempt to rape her vaginally, the second assailant forced his penis into her mouth. In the meantime, James also was attacked; he was punched, kicked with shod feet, and grabbed from behind with a stick pulled up against his neck, choking him. Suddenly, at the instigation of one of the group, the attackers left, two of them taking off in James's Camaro. James and Harriet, fearful that the assailants might return, swam across the lake to get help.

The defendant was charged with multiple offenses as a joint venturer[2] and was individually charged with rape and assault with intent to commit rape. Except as noted,[3] a jury convicted the defendant on all the joint venture charges but were deadlocked on the sexual assault charges. After a second trial on the sexual assault charges before a different judge, the defendant was convicted by a jury of both of those charges.

The defendant appeals from the denial of a motion to suppress evidence seized from his girlfriend's car prior to the police obtaining a warrant to search the vehicle, from the denial of a separate motion to suppress his sneakers, and from the refusal of the first trial judge to suppress a pair of nylon pants.[4] The sneakers and pants were taken from the defendant's person after he had been brought to the police station subsequent to his war-

---

[1] A pseudonym.

[2] Masked armed robbery of James, assault and battery of James by means of a dangerous weapon, assault and battery of Harriet and of James, armed assault with intent to rob Harriet, and carjacking.

[3] The jury convicted the defendant of the lesser offense of assault with intent to rob Harriet.

[4] The pants were not made part of the motion to suppress the sneakers, but were the subject of a voir dire at the first trial. The trial judge ruled that the motion judge's analysis as to the sneakers applied also to the pants.

rantless arrest.[5] He also claims error in the refusal of the second trial judge to allow him to read portions of Harriet's grand jury testimony at his second trial. We affirm the defendant's convictions.

1. *Motion to suppress evidence seized from the automobile.*[6] We take our findings from the memorandum of the first motion judge, supplemented on occasion by uncontradicted testimony at the hearing on the first motion to suppress. On June 6, 1996, the State police were notified of the incident. Officers went to the scene and also interviewed Harriet and James. Other events of importance to the investigation occurred on June 6. The police recovered James's Camaro, stripped of its stereo, speakers, and amplifier. Also on that day, Sergeant Stephen Matthews, who was involved in the investigation, received a tip that Jefferson Silva and three other males unknown to the informant were participants in the rape and carjacking at Mystic Lake. Matthews went to Silva's apartment where he saw speakers matching the description of the speakers taken from James's car. Silva indicated that he wished to cooperate, informed Matthews that he had been involved in the incident, and told him about the other participants: Chris Smith, two Salvadoran men, and a black male by the name of "Street." On the evening of the incident, Silva had met with the other participants and had driven to Mystic Lake in the defendant's Toyota Corolla automobile in search of someone to rob. Silva remained in the Toyota and acted as a lookout while the others proceeded toward a parked car. Later, three of the men returned to the Toyota and they drove off, followed by Smith in the stolen Camaro. The defendant told Silva that he had tried to "get into" the girl but could not.

Silva told Matthews that the defendant lived with his girlfriend at 585 Main Street in Medford, and Silva drove with Mat-

---

[5]Originally, the defendant had also sought to suppress statements he had made at the police station, but in view of the opinion in *Commonwealth* v. *Marquez*, 434 Mass. 370, 372 & n.1 (2001), issued after his trial, counsel correctly acknowledged at oral argument that he could no longer claim that the statements were subject to suppression.

[6]In his appellate brief the defendant states that the only item of evidentiary value at issue found in the car (in the trunk) was a Mobil credit card which had been in James's wallet.

thews to that address. Silva identified a parked blue Toyota Corolla automobile as the car he had driven during the incident. The defendant was arrested that evening at about 8:00 P.M.

After the defendant's arrest, Matthews began drafting affidavits in support of applications for warrants to search the defendant's apartment[7] and the blue Toyota Corolla. At about 1:15 A.M. on June 7, Matthews telephoned the troopers who were surveilling the apartment and the Toyota and told them the vehicle was going to be towed. Mistakenly believing the tow was en route, the troopers conducted an inventory search following written inventory procedures. At the time of the search the search warrant affidavits were still being drafted, and the warrants were not issued until about 4:00 A.M. The vehicle was towed to the State police barracks at approximately 4:45 A.M.

Because the vehicle was not yet in lawful police custody, the motion judge rejected the Commonwealth's argument that there was a valid inventory search. The judge also rejected the Commonwealth's claim that there were exigent circumstances. Since the troopers were watching the car, he reasoned that only if the defendant's girlfriend (the owner of the Toyota) had attempted to remove items from the vehicle, or to move the car itself, would exigent circumstances have existed to excuse the warrant requirement.

Citing Commonwealth v. O'Connor, 406 Mass. 112, 117-118 (1989), the judge concluded that the Commonwealth had satisfied the requirements of the inevitable discovery exception. While the judge's reliance on this exception may be correct, we need not reach the issue because our cases provide an established alternative basis for upholding the search. The police had probable cause to believe that the automobile seized was involved in the incident and therefore was likely to contain or otherwise provide evidence of the crimes. The defendant does not claim otherwise. In Commonwealth v. Motta, 424 Mass. 117, 124 (1997), the Supreme Judicial Court adopted the reasoning of Pennsylvania v. Labron, 518 U.S. 938, 940 (1996), and held that "when an automobile is stopped in a public place with probable cause, no more exigent circumstances are required by

---

[7] No claim is made on appeal concerning the search of the apartment.

art. 14 [of the Massachusetts Declaration of Rights] beyond the inherent mobility of an automobile itself to justify a warrantless search of the vehicle." In the present case, the Toyota, when seized, like the van in *Commonwealth* v. *Gajka*, 425 Mass. 751, 752 (1997), "was parked in a public place and was apparently capable of being moved. . . . [G]iven the mobility of such a vehicle, no further exigency is required." Although we base our decision on reasoning different from that of the motion judge, we agree with his conclusion denying the defendant's motion to suppress the evidence obtained from the car. See *Commonwealth* v. *Va Meng Joe*, 425 Mass. 99, 102 (1997).

2. *Motion to suppress evidence seized at the police station.* After the defendant's arrest, he was taken to the police station, where he was interrogated and where the black nylon pants he was wearing and his sneakers were taken from him. The pants were significant because Harriet had indicated that the second assailant wore dark pants, and that when he was hovering over her, she heard a swish of material.[8] The sneakers were important because the police had taken impressions of footprints at the scene, and, as it later turned out, the defendant's sneakers were consistent in size and manufacturing pattern with one of the impressions.

The judge who heard this motion (who was not the judge who heard the motion to suppress the evidence seized from the Toyota) made the following findings. He described the incident and subsequent information given to the police by two of the persons involved, Smith[9] and Silva. Silva's evidence, as related by the judge, was substantially similar to that described by the first motion judge. Of note is that Silva told the police that he knew the defendant by his nickname, "Street."

After Silva had pointed out to the police the location of the defendant's apartment and car, two troopers, during the course

---

[8] All the attackers wore bandanas so that their features below the nose were not visible.

In her opening at the second trial, the prosecutor pointed out that at the time defendant began to straddle Harriet, she "was conscious of what was a swishing sound of material, like nylon running pants, the dark pants that the defendant was wearing."

[9] Apparently Smith was the person who gave Sergeant Matthews the tip discussed by the first motion judge.

of June 6, 1996, conducted a surveillance of the apartment building and the vehicle. They observed the defendant driving the Toyota Corolla at 11:45 A.M. and again at 3:30 P.M. The defendant's name was not known to the officers at that time.[10] At approximately 8:10 P.M., the troopers, knowing that the defendant was still in the multifamily building, entered through an unlocked front door and knocked on the door on the third floor. The defendant opened it, and one of the troopers recognized him as the driver of the Toyota. They asked him his name, and he answered, "Eddie Street." The defendant was placed under arrest and advised of his Miranda rights. At his request, he was permitted to put on a pair of sneakers and was then transported to the police station. The premises were secured in order that the police could apply for a search warrant. After being interviewed at the police station, the defendant was brought to his cell, where troopers seized his sneakers and pants.

The judge ruled that the arrest was valid because there were exigent circumstances and hence the seizure was proper. On our independent review, see *Commonwealth v. Jones*, 375 Mass. 349, 354 (1978), we conclude that the Commonwealth has not sustained its burden of demonstrating that there was an exigency justifying the warrantless arrest.

Applying the factors set forth in *Commonwealth v. Forde*, 367 Mass. 798, 807 (1975), the judge noted the crime was one of violence, and that there was probable cause based on the victims' descriptions and the identifications by Smith and Silva against their own penal interests. He concluded: "Since there were five perpetrators and two of them, Smith and Silva, were aware of the police investigation focusing on them, and two other suspects were unidentified at the time, there was a likelihood defendant might escape if not apprehended."

"Under the exception for exigent circumstances, [however,] there must be a showing that it was impracticable for the police to obtain a warrant, and the standards as to exigency are strict." *Commonwealth v. Forde*, 367 Mass. at 800. The apartment was under surveillance, a number of police were at hand who could prevent flight (indeed, five officers went to the apartment to ef-

---

[10]The transcript of the hearing shows they thought "Street" was a nickname.

fect the arrest), see *Commonwealth* v. *Huffman*, 385 Mass. 122, 126 (1982), the police had probable cause to arrest, and, from what appears, the police could have obtained a warrant.[11] Since Smith and Silva were cooperating with the police, there was little likelihood they would alert the defendant, and there was no suggestion that evidence would be destroyed or that the defendant was in a position to escape given the surveillance. As was the situation in *Commonwealth* v. *Huffman*, the

> "Commonwealth did not offer any evidence that the defendant was armed, that he might flee, or even that the defendant was aware of the officers' [surveillance]. . . . [T]he Commonwealth did not offer any evidence as to the time it would take to get a warrant, or indicate that it would be impractical to get one."

*Id.* at 125. Its only rationale, which we indicated was invalid, was that they did not know the defendant's name. See note 11, *supra*.

Our analysis does not end with the determination that the arrest was illegal; we consider the seizure of the defendant's sneakers and pants at the police station permissible under the reasoning of *Commonwealth* v. *Marquez*, 434 Mass. 370 (2001),

---

[11]Citing *Commonwealth* v. *Boswell*, 374 Mass. 263, 268 (1978), the Commonwealth proffers an alternative argument for validating the arrest. It argues that since it did not know the defendant's name, it did not have probable cause until the defendant identified himself, and therefore it could not obtain a warrant. Once he identified himself, there were exigent circumstances. Unlike the situation in *Boswell*, where the address and names of the defendants were learned through an anonymous tip, and there was not probable cause to obtain a warrant, here, as the judge found, the police had probable cause to arrest the defendant even if his name was unknown or if he was only known by a nickname. Accordingly, they could have procured a John Doe warrant. See *Commonwealth* v. *Baldassini*, 357 Mass. 670, 674-675 (1970).

Another alternative argument made by the Commonwealth is that the defendant was arrested while the police were still standing in a common hallway and therefore no warrant was necessary. This argument is disposed of by *Commonwealth* v. *Marquez*, 434 Mass. at 376 n.5, where, albeit in dictum, the court declined to follow *United States* v. *Santana*, 427 U.S. 38 (1976), even if the defendant had been at or on the threshold of his apartment. "Making the analysis turn on precisely where the arrestee is standing when he or she opens the door to the home will cause unnecessary litigation and substitute a measure of uncertainty for a settled black letter rule of constitutional law." *Commonwealth* v. *Marquez, supra*.

the case adopting the principles stated in *New York* v. *Harris*, 495 U.S. 14 (1990). As pointed out in *Marquez*, the United States Supreme Court

> "held that 'where the police have probable cause to arrest a suspect, the [Fourth Amendment's] exclusionary rule does not bar [the admission] of a statement made by the defendant outside his home, even though the statement is taken after an arrest made in the home in violation of [his rights].' "

*Marquez, supra* at 377, quoting from *Harris, supra* at 21. The Court noted that "the purpose of the warrant requirement for an arrest in the home is 'to protect the home, and anything incriminating the police gather[] from arresting [a defendant] in his home.' " *Marquez, supra* at 377, quoting from *Harris, supra* at 20. The majority in *Marquez* considered that upholding otherwise valid statements given at the police station would not cause the police to ignore the rule of *Payton* v. *New York*, 445 U.S. 573, 590 (1980), requiring a warrant:

> "The penalty for an unlawful arrest in a defendant's dwelling is the suppression of anything seized at the time of the arrest, either from the defendant or in the dwelling, and any statements made at the time of the arrest. It is at this point, i.e., the time of the arrest, that some of the most incriminatory evidence is commonly obtained. The police are unlikely to risk the loss of the admission of that evidence in the hope that the defendant will confess to the crime later at the police station."

*Marquez, supra* at 378. See *Harris, supra* at 20, where the Court pointed out that despite its holding, "the principal incentive to obey *Payton* still obtains: the police know that a warrantless entry will lead to the suppression of any evidence found, or statements taken, inside the home."[12]

The reasoning of *Marquez* (and *Harris*) applies to the sneak-

---

[12]We are aware that in *Commonwealth* v. *Pietrass*, 392 Mass. 892, 900 (1984), clothing taken from the defendant at the police station after his warrantless arrest in the home was held inadmissible as "fruit of the poisonous tree." That case, however, was decided prior to *Marquez* and is inconsistent with the discussion in *Marquez*, which specifically pointed out that *Harris* "rejected the 'attenuation' analysis" as inappropriate because the defendant's

ers and pants taken from the defendant at the police station. Of significance is the following language in *Marquez*, quoting from *Harris*:

> " '[N]othing in the reasoning of [*Payton* v. *New York, supra,*] suggests that an arrest in a home without a warrant but with probable cause somehow renders unlawful [the] continued custody of the suspect once he is removed from the house . . . . Because the officers had probable cause to arrest [the defendant] for a crime, [he] was not unlawfully in custody when he was removed to the station house, given Miranda warnings, and allowed to talk.' "

*Marquez, supra* at 377-378, quoting from *Harris, supra* at 18. If the defendant was lawfully in custody for purposes of permitting admission of his statements, the same reasoning would appear to apply to the seizure of his clothing. Cf. *Commonwealth* v. *Gliniewicz*, 398 Mass. 744, 750 (1986).

Indeed, this is the interpretation of the majority opinion taken by the dissent in *Marquez*: "Under the court's decision, *any evidence seized* or statements made after the suspect is removed from the home would be admissible despite the illegal conduct" (emphasis supplied). *Marquez, supra* at 382 (Cowin, J., dissenting). We also note that decisions elsewhere have applied *Harris* to physical evidence taken from a defendant as well as to statements. E.g., *People* v. *Watkins*, 26 Cal. App. 4th 19, 31 n.8 (1994); *People* v. *Alexander*, 212 Ill. App. 3d 1091, 1104-1105 (1991). See *Timmons* v. *State*, 734 N.E.2d 1084, 1086 (Ind. Ct. App. 2000). Cf. *Carranza* v. *State*, 266 Ga. 263, 268 (1996).

3. *Grand jury testimony.* The defendant claims that the second trial judge erred in refusing to permit the defendant, after the Commonwealth rested, to read a portion of Harriet's prior grand jury testimony. He argues this testimony was admissible as a

---

statement, made at the police station after an unlawful arrest at his home, was, nevertheless, not "the fruit of having been arrested in the home rather than someplace else." *Marquez, supra* at 378, quoting from *Harris, supra* at 19.

prior inconsistent statement.[13] Although the Commonwealth argues that the defendant should have raised this issue on cross-examination of Harriet, extrinsic evidence of inconsistent statements is, in some circumstances, admissible in Massachusetts even without cross-examination. *Robinson* v. *Old Colony St. Ry.*, 189 Mass. 594, 596 (1905). Liacos, Massachusetts Evidence § 6.7.2(a) (7th ed. 1999). Since the rapist was Harriet's second assailant, whether she was inconsistent as to her description of the first assailant was "collateral to all issues in the case, save the victim's credibility. The victim's testimony on matters not relevant to contested issues in the case cannot, as of right, be contradicted by extrinsic evidence." *Commonwealth* v. *Sherry*, 386 Mass. 682, 693 (1982). There was no abuse of discretion in not allowing this testimony. See *Commonwealth* v. *Bettencourt*, 361 Mass. 515, 519-520 (1972).

*Judgments affirmed.*

---

[13]At the grand jury hearing, Harriet testified that she was not able to notice anything about the first assailant's features that were exposed above his nose. At trial she said she saw his eyes and they appeared slanty.